RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 24a0223p.06

# UNITED STATES COURT OF APPEALS

### FOR THE SIXTH CIRCUIT

─────────────────

ROBERT HOLMAN,

*Plaintiff-Appellant*,

*v.*

No. 23-5493

THOMAS J. VILSACK, in his official capacity as Secretary of the United States Department of Agriculture; ZACH DUCHENEAUX, in his official capacity as Administrator of the Farm Service Agency,

*Defendants-Appellees*.

─────────────────

Appeal from the United States District Court for the Western District of Tennessee at Jackson.
No. 1:21-cv-01085—S. Thomas Anderson, District Judge.

Decided and Filed: September 23, 2024

Before: STRANCH, LARSEN, and DAVIS, Circuit Judges.

─────────────────

### COUNSEL

**ON BRIEF:** Braden H. Boucek, Kimberly S. Hermann, SOUTHEASTERN LEGAL FOUNDATION, Roswell, Georgia, William E. Trachman, MOUNTAIN STATES LEGAL FOUNDATION, Lakewood, Colorado, for Appellant. Jeffrey E. Sandberg, Thomas Pulham, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellees.

STRANCH, J., delivered the opinion of the court in which DAVIS, J., joined. LARSEN, J. (pp. 14–22), delivered a separate dissenting opinion.

————————————

## OPINION

————————————

JANE B. STRANCH, Circuit Judge.  This appeal concerns a litigant's petition for fees under the Equal Access to Justice Act (EAJA).  Plaintiff Robert Holman successfully obtained a preliminary injunction freezing a debt-relief program that used racial categories to remedy prior discrimination against farmers and ranchers.  Following additional proceedings, but before final judgment, Congress repealed the challenged program.  Holman now seeks fees associated with the litigation.  The district court denied that request because, in its view, Holman was not a "prevailing party" under the EAJA.  We neither adopt nor definitively reject that conclusion.  Instead, we find that the Government's position during the litigation was "substantially justified" within the EAJA's meaning.  On that basis, we **AFFIRM** the judgment below.

## I.  BACKGROUND

In March 2021, President Biden signed into law the American Rescue Plan Act, which provided various forms of emergency assistance in the COVID-19 pandemic's wake.  Section 1005 of the Act was a debt-relief program for "socially disadvantaged" farmers and ranchers.  It authorized the Secretary of Agriculture to pay to Black, American Indian/Alaskan Native, Hispanic, Asian, and Hawaiian/Pacific Islander farmers and ranchers up to 120 percent of certain farm loans previously issued by the United States Department of Agriculture (USDA).  The congressional record explains that the legislation was designed to provide targeted relief for farmers against whom the USDA had historically discriminated and for whom prior pandemic relief efforts had failed.

A number of challenges to Section 1005 were filed.  In Tennessee, farmer Robert Holman filed a complaint and motion to preliminarily enjoin the program in early June 2021, alleging that he would have been eligible for Section 1005's benefits but for his race.  His preliminary injunction motion argued that Section 1005 should be halted nationwide because Defendants—heads of the USDA and its subagency the Farm Service Agency, collectively the Government—could not satisfy the strict scrutiny applied to racial classifications under the Fifth

Amendment's Equal Protection Clause and because other injunction-related factors favored his position. The Government agreed that strict scrutiny applied, but contended that Section 1005 was nonetheless constitutional and that other considerations weighed against issuing an injunction.

Meanwhile, similar litigation was proceeding in other courts. On June 10, 2021, a district court in Wisconsin entered a temporary restraining order barring the USDA from forgiving any loans pursuant to Section 1005. *Faust v. Vilsack*, 519 F. Supp. 3d 470, 478 (E.D. Wis. 2021). On June 23, a Florida district court preliminarily enjoined Section 1005 nationwide. *Wynn v. Vilsack*, 545 F. Supp. 3d 1271, 1295 (M.D. Fla. 2021). And on July 1, a district court in Texas both enjoined the Government from considering race under Section 1005 and certified a class action of all farmers and ranchers excluded from Section 1005 by the "socially disadvantaged" criterion. *Miller v. Vilsack*, No. 4:21-cv-0595-O, 2021 WL 11115194, at *3, 12 (N.D. Tex. July 1, 2021).

The district court granted Holman's preliminary injunction motion on July 8, 2021. It reasoned that the Government had failed to make the strict scrutiny showing that Section 1005 was narrowly tailored to serve a compelling governmental interest. The district court further explained its view that an injunction was necessary to protect Holman from irreparable injury and that the public interest weighed in favor of injunctive relief, but also acknowledged that an injunction could cause substantial harm to others—namely, socially disadvantaged farmers who sought access to Section 1005's funds. Finally, despite expressing reservations about issuing a nationwide injunction, the court found that alternative relief would be unworkable and enjoined the Government from implementing Section 1005 in its entirety.

On January 26, 2022, the district court granted the Government's motion to dismiss counts two and three of Holman's complaint, in which Holman had argued that the USDA planned to illegally make Section 1005 funding recipients eligible for future relief programs. The Government contended that with these counts dismissed, Holman's case presented materially identical issues to the Texas class action litigation where Holman was necessarily a class member, so a stay of Holman's case was necessary to prevent inconsistent rulings. On February 16, the district court granted the Government's stay motion.

Half a year later, with this case still stayed, the Inflation Reduction Act became law and repealed Section 1005. The parties agreed that Section 1005's repeal mooted Holman's challenge and, accordingly, stipulated to the case's dismissal. Holman then moved for fees and costs as a "prevailing party" under the EAJA. *See* 28 U.S.C. § 2412(d)(1)(A). The district court denied the motion, reasoning that because the "temporary and revocable" nature of the injunctive relief previously awarded to Holman provided him "with nothing lasting," Holman was not a prevailing party within the EAJA's meaning. Holman timely appealed.

## II. ANALYSIS

The EAJA modifies the American legal system's default rule "that each party pays its own costs and attorney's fees." *Griffith v. Comm'r of Soc. Sec.*, 987 F.3d 556, 563 (6th Cir. 2021). Under the EAJA, a "prevailing party" in a civil case against the United States is entitled to "fees and other expenses" and certain "costs" unless "the position of the United States was substantially justified" or "special circumstances make an award unjust." 28 U.S.C. § 2412(d)(1)(A). The parties dispute all three aspects of § 2412(d)(1)(A)—whether (1) Holman was a prevailing party, (2) the Government's litigating position was substantially justified, and (3) special circumstances otherwise preclude a fees award. Finding the first two issues sufficient to resolve the case, we take them up in turn.[1]

### A. Prevailing Party

We review a plaintiff's entitlement to prevailing party status de novo. *Miller v. Caudill*, 936 F.3d 442, 448 (6th Cir. 2019). To be a prevailing party, "a plaintiff must have 'been awarded some relief by the court.'" *Tenn. State Conf. of NAACP v. Hargett*, 53 F. 4th 406, 410 (6th Cir. 2022) (quoting *Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Hum. Res.*, 532 U.S. 598, 603 (2001)).[2] Beyond that baseline requirement, whether a claimant

---

[1]Although the district court's conclusion that Holman was not a prevailing party meant that it did not reach the substantial-justification or exceptional-circumstances issues, both parties have had a "full and fair opportunity to address" these questions and urge us to reach them as necessary. *Smith v. Jefferson Cnty. Bd. of Sch. Comm'rs*, 641 F.3d 197, 205 (6th Cir. 2011).

[2]As the district court recognized, interpretations of the phrase "prevailing party" in cases involving 42 U.S.C. § 1988 and the EAJA are equally applicable to both statutes. *See Hensley v. Eckerhart*, 461 U.S. 424, 433 n.7 (1983) ("The standards set forth in this opinion [concerning § 1988 fee awards] are generally applicable in all

who "prevails in one sense (by receiving a preliminary injunction) but not in another sense (by failing to obtain a final judgment when the case becomes moot)" is entitled to prevailing party status "requires a 'contextual and case-specific' response." *Roberts v. Neace*, 65 F.4th 280, 284 (6th Cir. 2023) (quoting *McQueary v. Conway*, 614 F.3d 591, 604 (6th Cir. 2010)). Generally, preliminary injunctions alone are insufficient to show that a party prevailed within the EAJA's meaning. *Id.* "But a preliminary injunction may well suffice if it mainly turns on the likelihood-of-success inquiry and changes the parties' relationship in a material and enduring way." *Id.*

Both parties present weighty arguments on this question. The Government contends that because orders entered by other courts had already halted Section 1005's implementation nationwide, *see, e.g.*, *Wynn*, 545 F. Supp. 3d at 1295, the injunction in this case did not "directly benefit the 'plaintiff by modifying the defendant's behavior toward him'" and was accordingly not "material." *Hargett*, 53 F.4th at 410 (quoting *McQueary*, 614 F.3d at 598 (cleaned up)). It further argues that Holman's relief was not "enduring" because it gave him no "irrevocable" benefit; both before and after the injunction, Holman could not access Section 1005's funds. The district court agreed that Holman was not a prevailing party, largely focusing on his failure to obtain irrevocable relief.

Holman notes, however, that several relevant considerations point in his direction. For example, there is no question that the district court's preliminary injunction opinion mainly turned "on the likelihood-of-success inquiry." *Roberts*, 65 F.4th at 284. Further, we have previously explained that in determining "whether a claimant directly benefitted from litigation, we usually measure the plaintiff's gain based on the relief requested in his complaint, not based on the practical significance of the relief obtained." *McQueary*, 614 F.3d at 602. This reasoning suggests that the preliminary injunction, which granted Holman the relief requested in his motion, may have been material even though—because of the previously issued injunctions—it did not require the Government to immediately change its behavior.

---

cases in which Congress has authorized an award of fees to a 'prevailing party.'"); *Bryant v. Comm'r of Soc. Sec.*, 578 F.3d 443, 449 (6th Cir. 2009).

As for whether his relief was enduring, Holman observes that the thirteen-month-long injunction here was in place longer than in several cases in which the plaintiff was deemed the prevailing party. *See, e.g.*, *G.S. ex rel. Schwaigert v. Lee*, No. 22-5969, 2023 WL 5205179, at *6 (6th Cir. Aug. 14, 2023) (finding an injunction lasting as little as two-to-six months sufficiently lengthy to qualify a plaintiff as a prevailing party); *Hargett*, 53 F.4th at 410-11 (same as to an injunction that lasted seven months). The injunction's "nature," moreover, was not "ill-considered, hastily entered, or tentative"—it neither "maintain[ed] the status quo without addressing the merits" nor was "later overturned, repudiated, or vacated." *Roberts*, 65 F.4th at 284. Finally, Holman contends that the injunction did provide irrevocable relief by preventing the harm caused each day by Section 1005: his "inability to compete on equal footing" with others for funding. *Ne. Fla. Chapter, Associated Gen. Contractors of Am. v. Jacksonville*, 508 U.S. 656, 666 (1993).

Determining "whether or when the winner of a preliminary injunction may be treated as a 'prevailing party'" is always a "thorny" undertaking. *McQueary*, 614 F.3d at 596. Considering the record and both parties' substantial arguments, we conclude only that determining a plaintiff's prevailing party status is particularly fraught where, as here, he succeeds in preliminarily enjoining a statute or rule but cannot use that injunction to take any specific action. We instead resolve the issue of Holman's entitlement to EAJA fees on a clearer ground: whether the Government's litigating position was substantially justified.

## B. Substantial Justification

Even if a litigant is a prevailing party under the EAJA, he is not entitled to fees if "the position of the United States was substantially justified." 28 U.S.C. § 2412 (d)(1)(A). The Government bears the burden of demonstrating substantial justification, *Griffith*, 987 F.3d at 563, which requires the position to "be 'more than merely undeserving of sanctions for frivolousness,'" *id.* (quoting *Pierce v. Underwood*, 487 U.S. 552, 565 (1988)). But it need not represent a winning argument. *Id.* Instead, the position need only be "justified to a degree that could satisfy a reasonable person" such that "a reasonable person could think it correct." *Id.* (quoting *Pierce*, 487 U.S. at 565, 566 n.2).

What "matter[s] most" to the substantial justification analysis is "the actual merits of the Government's litigating position." *Id.* (quoting *United States ex rel. Wall v. Circle C. Constr., LLC*, 868 F.3d 466, 471 (6th Cir. 2017)). The merits of that position are considered "as a whole." *Id.* at 564 (quoting *Amezola-Garcia v. Lynch*, 835 F.3d 553, 555 (6th Cir. 2016)); *see also Comm'r, Immigr. & Naturalization Serv. v. Jean*, 496 U.S. 154, 160 (1990) (noting that the substantial justification inquiry considers the entire litigation and "operates as a one-time threshold for fee eligibility"). In doing so, we recognize the difference "between cases in which 'the government lost because it vainly pressed a position flatly at odds with the controlling case law' and cases in which 'the government lost because an unsettled question was resolved unfavorably.'" *Griffith*, 987 F.3d at 564 (quoting *Taucher v. Brown-Hruska*, 396 F.3d 1168, 1174 (D.C. Cir. 2005) (Roberts, J.)) (internal quotation marks omitted).

In addition to the merits of the Government's position, other "'objective indicia' of reasonableness" may be relevant, though not dispositive. *Id.* at 563 (quoting *Wall*, 868 F.3d at 471). These indicia include whether the Government's position follows a string of losses or successes, *id.*, as well as "the stage at which the proceedings were resolved," *Dvorkin v. Gonzales*, 173 F. App'x 420, 424 (6th Cir. 2006) (quoting *United States v. 2323 Charms Road*, 946 F.2d 437, 440 (6th Cir. 1991)).

As an initial matter, the Government urges us to adopt a presumption that its position is substantially justified whenever it defends a federal statute. That presumption, the Government argues, flows from its "duty to defend the constitutionality of statutes whenever reasonable arguments can be made in their defense." But the EAJA directs the court to examine the justification for the Government's "position," not its conduct. 28 U.S.C. § 2412(d)(1)(A). At best, therefore, the Government's duty to defend Section 1005 "explains . . . *why* [it] took the position it did," but it does not answer the "question under [the] EAJA" of "whether that position was substantially justified." *Taucher*, 396 F.3d at 1175 (Roberts, J.). The Government's claimed presumption, moreover, could effectively insulate it from liability even when defending unreasonable positions—a result fundamentally at odds with the EAJA's "specific purpose" of eliminating "for the average person the financial disincentive to challenge unreasonable governmental actions." *Jean*, 496 U.S. at 163. As a result, though we need not deem the

Government's duty to defend irrelevant in every substantial-justification inquiry, we decline to adopt a presumption that the Government is substantially justified anytime it defends a federal statute.

Instead, we return to the considerations outlined in our caselaw, starting with the Government's merits position during the central aspect of this litigation:  that the district court should not preliminarily enjoin Section 1005.  It was Holman's burden as the movant to "present 'a clear showing'" that the injunctive-relief factors weighed in his favor.  *L.W. ex rel. Williams v. Skrmetti*, 83 F.4th 460, 471 (6th Cir. 2023) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)).  Considered within the EAJA's framework, this burden means that the Government's position was substantially justified "if 'a reasonable person could think it correct'" that Holman had not made the requisite clear showing of likely success necessary to receive injunctive relief.  *Griffith*, 987 F.3d at 563 (quoting *Pierce*, 487 U.S. at 566 n.2).

The first issue in Holman's preliminary injunction motion—the likelihood of success on the merits—turned on the constitutionality of Section 1005's relief for socially disadvantaged farmers.  Like all programs that differentiate based on race, Section 1005 was subject to strict scrutiny.  *Fisher v. Univ. of Tex. at Austin*, 570 U.S. 297, 310 (2013); *Grutter v. Bollinger*, 539 U.S. 306, 326-27 (2003); *Vitolo v. Guzman*, 999 F.3d 353, 360 (6th Cir. 2021).  The Government therefore had to show that the program was narrowly tailored to further a compelling governmental interest.  *Fisher*, 570 U.S. at 310.  Holman misapprehends this standard by positing that the Government was required to "present evidence of current, intentional discrimination when seeking to uphold a racial preference scheme."  To the contrary, remedying the effects of past discrimination constitutes a compelling governmental interest where the remedial policy targets specific episodes of past discrimination and there is evidence that the Government intentionally participated in that discrimination.  *Vitolo*, 99 F.3d at 361; *see Associated Gen. Contractors of Ohio, Inc. v. Drabik*, 214 F.3d 730, 735 (6th Cir. 2000) ("There is no question that remedying the effects of past discrimination constitutes a compelling governmental interest."); *Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S.

701, 720 (2007).[3]  Narrow tailoring, in turn, requires the Government to show "serious, good faith consideration of workable race-neutral alternatives," but "does not require exhaustion of every conceivable" alternative.  *Fisher*, 570 U.S. at 312 (quoting *Grutter*, 539 U.S. at 339) (emphasis omitted).

Acknowledging the high bar set by strict scrutiny, the Government presented substantial record evidence to defend the program's constitutionality.  Some of the Government's evidence regarding its compelling interest addressed past discrimination against minority groups generally.  For example, a 1997 report contained evidence that the USDA had "done more to hurt than to help small and minority farmers" because many minority farmers' loan applications and discrimination complaints languished within the Agency.  A 2011 Civil Rights Assessment "substantiated" continued "claims of denial of equal program access" by minority applicants and suggested the existence of "continuing institutional discrimination" by the Agency.  And a 2019 governmental report explained that "allegations of unlawful discrimination against [socially disadvantaged farmers and ranchers] in the management of USDA programs are long-standing and well-documented."  These reports represent evidence of past discrimination by the USDA against socially disadvantaged farmers generally.

Building on that evidence, the Government also provided examples of past discrimination by the USDA against many specific groups.  As detailed in governmental reports and federal litigation terminating in substantial settlements, the USDA had a history of dealing reluctantly with and denying loans to Black farmers; loans that were issued, moreover, were often provided at unfavorable times or contained burdensome requirements not imposed on non-Black farmers.  Hispanic farmers stated that they had been "stereotyped as being farm workers, rather than owners," and received "inconsistent or incomplete" information from the USDA; one farmer said Hispanic growers had been "systematically excluded" from USDA programs.  Asian farmers were among those who alleged in the late 1990s that the USDA had hurt rather than helped

---

[3]Though cases decided after the Government articulated its position do not affect the substantial-justification analysis, *see Griffith*, 987 F.3d at 565-66, we observe that the Supreme Court has recently reiterated that remedying past intentional discrimination constitutes a compelling interest.  *See Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 207 (2023) (specifying that "remediating specific, identified instances of past discrimination that violated the Constitution or a statute" is a compelling interest).

minority farmers, and some reported in 2011 "a general consensus . . . that they are not always treated fairly by the USDA."  And in 2019, Native American farmers reported that "discrimination [has] contribute[d] to the lack of commercial lending on tribal lands"; similar allegations resulted in a large settlement between the USDA and Native farmers and ranchers.

Finally, to support its argument that Section 1005 was narrowly tailored to addressing the compelling interest in remedying this identified past discrimination, the Government pointed to "the inefficacy of the race-neutral alternatives that Congress tried for years before enacting § 1005", the time-limited nature of the Section 1005's relief, and the administrative difficulty of quickly administering relief to minority farmers disproportionately harmed by the pandemic.

In short, the Government placed before the district court a "strong basis in evidence for its conclusion that remedial action" in the form of Section 1005 "was necessary." *Drabik*, 214 F.3d at 735 (quoting *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 500 (1989)).  It pointed to "specific episode[s] of past discrimination" against socially disadvantaged farmers and ranchers, statistical and anecdotal "evidence to establish intentional discrimination," and examples of the USDA's role in "the past discrimination it now seeks to remedy." *Vitolo*, 999 F.3d at 361.  Finally, it explained Congress's view as to why "race-neutral alternatives"—some of which had already been tried, and others of which were impractical—constituted insufficient remedies. *Fisher*, 570 U.S. at 312 (quoting *Grutter*, 539 U.S. at 339).

In granting a preliminary injunction, the district court ultimately rejected these arguments.  In doing so, it rightly recognized the difficulty of satisfying strict scrutiny and evaluated an issue—when and how the Government may permissibly act to remedy past discrimination—that was "controversial, thorny, and unsettled" at the time and remains so today. *Vitolo*, 999 F.3d at 366 (Donald, J., dissenting).  That thorniness flows in part from the legal tests in this area of the law, many of which are matters of degree rather than cleanly drawn lines.  For example, when do statistical disparities between racial groups, which may be insufficient by themselves to show intentional discrimination, nonetheless represent sufficiently probative "evidence [of] intentional discrimination" that a court may infer intent? *See id.* at 361.  And how many options must the Government evaluate to show a "serious, good faith consideration of race-neutral alternatives?" *See Fisher*, 570 U.S. at 312 (quoting *Grutter*, 539 U.S. at 339).  That

thoughtful judges could, on this record, readily reach different answers on these and other questions suggests that the Government "lost because an unsettled question was resolved unfavorably," not because it "vainly pressed a position flatly at odds with the controlling case law." *Griffith*, 987 F.3d at 564 (quoting *Taucher*, 396 F.3d at 1173) (internal quotation marks omitted).

The dissent concludes otherwise primarily by relying on *Vitolo*, which explained that a race-conscious program is unconstitutional where the Government provides "little evidence of past intentional discrimination against the many groups to whom it grants preferences." 999 F.3d at 361. But here, as chronicled above, the Government provided evidence of intentional USDA discrimination against socially disadvantaged farmers and ranchers generally, and buttressed that evidence with specific examples of intentional discrimination against nearly every group included in the socially disadvantaged category. That is categorically distinct from the evidentiary presentation in *Vitolo*, which did "not identify specific incidents of past discrimination" and relied entirely on "general social disparities." *Id.* at 361-62. Nor is this a case in which the Government provided "absolutely no evidence of past discrimination" against most of the categories included in a race-conscious program. *J.A. Croson Co.*, 488 U.S. at 506 (emphasis removed). The notion that the Government was clearly required, at the preliminary injunction stage, to provide specific examples of intentional discrimination against every category included in a race-conscious program is also difficult to square with the Supreme Court's instruction that narrow tailoring does not demand perfection. *See Fisher*, 570 U.S. at 312; *Grutter*, 539 U.S. at 339; *accord J.A. Croson Co.*, 488 U.S. at 510 (holding that "evidence of a pattern of individual discriminatory acts can, if supported by appropriate statistical proof, lend support to a . . . government's determination that broader remedial relief is justified."). It was Holman's duty to make a clear showing of likely success on the merits, *Skrmetti*, 83 F.4th at 471—but here, "a reasonable person could think" that the Government's evidence supporting Section 1005's constitutionality sufficiently undermined Holman's required showing. *Pierce*, 487 U.S. at 566 n.2. As a result, the Government's position on this aspect of the litigation was substantially justified.

Governing precedent, moreover, requires us to consider the entirety of the Government's "arguments made during litigation" in determining whether its "whole position" was substantially justified. *Id.* And other aspects of the litigation, not addressed by the dissent, reinforce the reasonableness of the Government's position "as a whole." *Id.* (quoting *Amezola-Garcia*, 835 F.3d at 555). In opposing the injunction motion, for instance, the Government contended that the injunctions against Section 1005 already issued by other courts eliminated the threat of irreparable harm to Holman. Although the district court rejected this argument, some courts have "concluded that once another district court has entered the same relief" sought by a plaintiff, that plaintiff is "no longer able to demonstrate the irreparable harm that [is] needed to justify the extraordinary relief requested" by a preliminary injunction. *Faust v. Vilsack*, No. 21-C-548, 2021 WL 2806204, at *3 (E.D. Wis. July 6, 2021) (collecting cases). It was not unreasonable for the Government to raise this argument against Holman's motion.

The Government also won a later motion to dismiss the second and third counts of Holman's complaint, which encompassed his claims that the USDA was planning to illegally make Section 1005 funding recipients eligible for future debt relief. This aspect of the litigation was less "prominent" than the preliminary injunction motion, through which Holman successfully enjoined Section 1005. *Griffith*, 987 F.3d at 564 (quoting *EEOC v. Memphis Health Ctr.*, 526 F. App'x 607, 615 (6th Cir. 2013)). Nonetheless, this part of the Government's position was not only reasonable but ultimately meritorious.

Holman observes that before the district court decided the preliminary injunction motion, the Government had already suffered a "string of losses" in other courts, which "can be indicative" of the unreasonableness of the Government's position. *Pierce*, 487 U.S. at 569. But this and other "objective indicia" of the Government's position, while "relevant," matter less than "the actual merits of the Government's litigating position"—a position that, as shown above, was substantially justified. *Griffith*, 987 F.3d at 563 (quoting *Wall*, 868 F.3d at 471). And other objective criteria support the Government's position, including "the stage in which the proceedings were resolved." *Dvorkin*, 173 F. App'x at 424 (quoting *2323 Charms Road*, 946 F.2d at 440). Because each of the decisions concerning Section 1005 were issued in a preliminary posture, no court had definitively deemed the program unconstitutional. Thus, not

only do those decisions matter less than the actual merits of the Government's litigating position, but their import is lessened by their posture.

In sum, the Government took positions throughout this litigation that recognized governing precedent and attempted to satisfy it through the presentation of extensive evidence. Though these arguments did not convince the district court to deny Holman's preliminary injunction motion, "a reasonable person could think [them] correct." *Griffith*, 987 F.3d at 563 (quoting *Pierce*, 487 U.S. at 566 n.2). As a result, the Government has demonstrated that its position was substantially justified which, in turn, precludes Holman's entitlement to attorney's fees and expenses. *See* 28 U.S.C. § 2412 (d)(1)(A).

### III. CONCLUSION

For the reasons set forth above, we **AFFIRM** the judgment of the district court.

_____

**DISSENT**

_____

LARSEN, Circuit Judge, dissenting.  A "prevailing party" in a civil case against the United States is entitled to fees and costs unless the government's position was "substantially justified" or "special circumstances make an award unjust."  So, to get fees and costs, Holman must show that he is a prevailing party.  Even if he does, though, the government may avoid paying if it shows that its position was substantially justified or that special circumstances make an award unjust.  The majority, rightly recognizing that the prevailing-party issue is difficult, instead concludes that the government's position was substantially justified.  I cannot agree. I first explain that disagreement and then tackle the more difficult question of whether Holman is a prevailing party.  I then address the special-circumstances question.  I conclude that Holman is a prevailing party because the preliminary injunction in this case turned primarily on the likelihood of success on the merits and afforded enduring and material relief; the government's position was not substantially justified because it was flatly at odds with controlling caselaw; and no special circumstances make an award unjust.  Holman is therefore entitled to fees and costs, so I respectfully dissent.

I.

Section 1005 of the American Rescue Plan Act authorized the USDA Secretary to "provide a payment in an amount up to 120 percent of the outstanding indebtedness of each socially disadvantaged farmer or rancher as of January 1, 2021, to pay off [direct and guaranteed farm loans]."  Pub. L. No. 117-2, § 1005(a)(2) (2021).  USDA defined "socially disadvantaged" based on race, extending debt relief to Black, American Indian/Alaskan Native, Hispanic, Asian, or Hawaiian/Pacific Islander farmers and ranchers, without any consideration of need.  86 Fed. Reg. 28,329, 28,330 (May 26, 2021).  Holman, who does not fall into any of the above racial categories, sued and obtained a preliminary injunction, temporarily enjoining the implementation of the debt-relief program.  Section 1005 was then repealed in the Inflation Reduction Act.  Pub. L. No. 117-169, § 22008 (2022).  That mooted the case, and the parties stipulated to dismissal.

Holman then moved for fees and costs under the Equal Access to Justice Act, 28 U.S.C. § 2412.  Under that statute, a "prevailing party" in a civil case against the United States is entitled to fees and costs unless the government's position was "substantially justified" or "special circumstances make an award unjust." *Id.* § 2412(d)(1)(A).  The district court denied Holman's motion—concluding that he is not a prevailing party.

## II.

## A.

The government is not required to pay fees and costs when it shows that its position was "substantially justified." *Id.*  A position is substantially justified if "a reasonable person could think it correct, that is, if it has a reasonable basis in law and fact." *Pierce v. Underwood*, 487 U.S. 552, 566 n.2 (1988).  The "actual merits" of the position is what "matter[s] most." *Griffith v. Comm'r of Soc. Sec.*, 987 F.3d 556, 563 (6th Cir. 2021).  The position must be better than one "merely undeserving of sanctions," though it need not ultimately prove correct. *Id.* (quoting *Pierce*, 487 U.S. at 566).

The majority concludes that the government has shown that its position was substantially justified.  I disagree.

### 1.

Section 1005 authorized debt relief based on race.  Pub. L. No. 117-2, § 1005 (2021); 86 Fed. Reg. 28,329, 28,330 (May 26, 2021).  That makes it presumptively invalid. *Vitolo v. Guzman*, 999 F.3d 353, 360 (6th Cir. 2021) (citing U.S. Const. amend. XIV).  The government can overcome that presumption only if it shows that the racial discrimination was narrowly tailored to achieve a compelling government interest. *Id.*  This standard (strict scrutiny) is "very demanding" and one which "few programs will survive." *Id.*

In the district court, the government accepted that strict scrutiny applied to this claim and argued that it had a "two-fold" compelling interest: "to remedy the lingering effects of prior discrimination against minority farmers in USDA loan (and other) programs and prevent public funds from being allocated in a way that perpetuates the effects of discrimination."  The Supreme

Court has said that "remedial policies can *sometimes* justify preferential treatment based on race." *Vitolo*, 999 F.3d at 361 (citing *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 493–94 (1989) (plurality); *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 237 (1995)). At a minimum, though, there must be a specific episode of past intentional discrimination on the part of the government against a particular group—disparate impacts are not enough. *Id.*

2.

The government, of course, does not have a compelling interest in remedying past discrimination that never happened. And when a government program seeks to remedy past discrimination against a number of different groups, it bears the burden to demonstrate "past intentional discrimination against the many groups to whom it grants preferences." *Id.* (faulting the "schedule of racial preferences detailed in the government's regulation—preferences for Pakistanis but not Afghans; Japanese but not Iraqis; Hispanics but not Middle Easterners—[a]s not supported by any record evidence at all"). The majority concludes that the government provided evidence of USDA discrimination against "*many* specific groups" defined as "socially disadvantaged." Maj. Op. at 9 (emphasis added). But what about the others? The government referred to no evidence of past intentional discrimination by USDA against Native Hawaiian and Pacific Islander farmers and ranchers. And the government relied only on broad assertions and statistical disparities to show discrimination against American Indian, Asian, and Native Alaskan farmers and ranchers. We might assume that such discrimination happened, but that is not enough. *See Vitolo*, 999 F.3d at 362 ("[W]hen it comes to general social disparities, there are simply too many variables to support inferences of intentional discrimination."). The government cannot claim a compelling interest in remedying discrimination without first showing that the discrimination happened. *Croson*, 488 U.S. at 505. That is reason enough to conclude that its position was not substantially justified.

That is not to say, in this preliminary posture, that the government made no compelling-interest showing. I agree with the majority that the government cited evidence of past intentional discrimination against Black farmers and ranchers. But if the government is going to use racially exclusionary measures as a remedy, the government's policy must be narrowly tailored to that particular interest. And "a policy is not narrowly tailored if it is either

overbroad or underinclusive in its use of racial classifications." *Vitolo*, 999 F.3d at 362. Here, the program extends debt relief to farmers and ranchers in groups never shown to have been discriminated against. Giving Native Hawaiian farmers and ranchers debt relief cannot remedy past discrimination against Black farmers and ranchers. The glaring "mismatch" between means and ends is far too much for strict scrutiny to bear. *Students for Fair Admissions, Inc. v. President and Fellows of Harvard Coll.*, 143 S. Ct. 2141, 2168 (2023). There is no "reasonable basis in law and fact" to find this policy narrowly tailored. *Pierce*, 487 U.S. at 566 n.2.

The majority contends that the Government was not "clearly required, at the preliminary injunction stage, to provide specific examples of intentional discrimination against every category included in [its] race-conscious program." Maj. Op. at 11. The Supreme Court says otherwise. To justify a "resort to race-based government action," the government had to show that it was "remediating *specific, identified* instances of past discrimination that violated the Constitution or a statute." *Students for Fair Admission, Inc.*, 143 S. Ct. at 2162 (emphasis added). And the preliminary posture of the litigation does not absolve the government of its burden. *See Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 429–30 (2006). Absent at least some specific evidence of intentional discrimination against each racial group, the government cannot show a compelling remedial interest in benefitting that group. It has not shown there is anything to remedy. *See Croson*, 488 U.S. at 505–06. The government's position—that § 1005 should not be preliminarily enjoined—was not substantially justified because the government presented arguments "flatly at odds with the controlling case law." *Griffith*, 987 F.3d at 564 (quoting *Taucher v. Brown-Hruska*, 396 F.3d 1168, 1174 (D.C. Cir. 2005)) (cleaned up).

## B.

Because I disagree that the government's position was substantially justified, I turn to the prevailing-party issue. In general, obtaining a preliminary injunction does not make a plaintiff a "prevailing party." *Planned Parenthood Sw. Ohio Region v. DeWine*, 931 F.3d 530, 538 (6th Cir. 2019). But, in cases that are later dismissed as moot, a preliminary injunction may suffice when it (1) turns primarily on the likelihood of success on the merits and affords (2) "enduring"

and (3) "material" relief.  *Miller v. Caudill*, 936 F.3d 442, 448 (6th Cir. 2019).  The inquiry is "case-specific," but we have tended to treat relief as enduring when it is "irrevocable" and as material when it "directly benefits" the plaintiff.  *Id.*; *see McQueary v. Conway*, 614 F.3d 591, 601 (6th Cir. 2010).

Although the question is not free from doubt, I believe that Holman is a prevailing party because the preliminary injunction in this case turned primarily on the likelihood of success on the merits and afforded enduring and material relief.

1.

As the majority finds, "there is no question that the district court's preliminary injunction opinion mainly turned on the likelihood-of-success inquiry."  Maj. Op. at 5 (cleaned up).  Holman clears this first hurdle with ease.

2.

Whether the relief was enduring is a more difficult question.  We have said that relief is enduring when it is "irrevocable."  *Miller*, 936 F.3d at 448.  Accordingly, we have found enduring relief where preliminary injunctions enabled plaintiffs to: attend church, *Roberts v. Neace*, 65 F.4th 280, 284 (6th Cir. 2023); register voters, *Tenn. State Conf. of NAACP v. Hargett*, 53 F.4th 406, 410–11 (6th Cir. 2022); prescribe mifepristone, *Planned Parenthood*, 931 F.3d at 541–42; get married, *Miller*, 936 F.3d at 448–49; and receive in-person education, *G.S. ex rel. Schwaigert v. Lee*, 2023 WL 5205179, at *6 (6th Cir. Aug. 14, 2023).  In each of those cases, the preliminary injunction afforded relief that was in some sense realized during the pendency of the injunction.  In contrast, we did not find enduring relief where a preliminary injunction temporarily prevented enforcement of a statute criminalizing protests at funerals when the plaintiff had not identified a funeral at which he planned to protest.  *McQueary v. Conway*, 508 F. App'x 522, 523–24 (6th Cir. 2012); *McQueary v. Conway*, 2012 WL 3149344, at *3 (E.D. Ky. Aug. 1, 2012).  We distinguished a Seventh Circuit case, *Young v. City of Chicago*, 202 F.3d 1000 (7th Cir. 2000), in which the plaintiffs wanted to protest at a particular event, and the injunction enabled them to do so.  *McQueary*, 508 F. App'x at 524.

The cases above make clear that relief is enduring only if it is irrevocable.  *See Miller*, 936 F.3d at 448.  That distinction is consistent with out-of-circuit caselaw.  *See Thomas v. Nat'l Science Found.*, 330 F.3d 486, 488–93 (D.C. Cir. 2003); *N. Cheyenne Tribe v. Jackson*, 433 F.3d 1083, 1084–86 (8th Cir. 2006).

To determine whether the preliminary injunction afforded Holman irrevocable relief, we must ask whether Holman benefitted from the injunction before the case was mooted. *Irrevocable*, *Black's Law Dictionary* (12th ed. 2024) ("committed beyond recall").  Or to ask the question differently, would Holman have benefitted even if the injunction had ultimately been vacated?  I believe the answer is "yes."  The preliminary injunction delayed the debt-relief program.  That secured a period of equal treatment, during which all borrowers were continuing to accrue interest, and decreased the present value of the debt-relief program.

It is important to remember the nature of the harm in a case like this.  In *Regents of the University of California v. Bakke*, 438 U.S. 265 (1978), the plaintiff challenged an admissions program that reserved spots in the entering medical-school class for minorities.  *Id.* at 279.  The Supreme Court explained that the plaintiff was harmed regardless of whether he would have been admitted to the class absent the challenged program.  *Id.* at 280 n.14.  The race-based exclusion from consideration was a harm separate and apart from any practical consequence of the exclusion.  So too in other race-based set-aside programs.  *See Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 666 (1993).  The harm in cases like this is "the denial of equal treatment resulting from the imposition of the barrier, not the ultimate inability to obtain the benefit."  *Id.*

The denial of equal treatment, *i.e.*, the "discrimination itself," causes "serious non-economic" harm.  *Heckler v. Mathews*, 465 U.S. 728, 739–40 (1984).  Because that harm is "not co-extensive with any substantive rights to the benefits denied the party discriminated against," it can be remedied "by withdrawal of benefits from the favored class as well as by extension of benefits to the excluded class."  *Id.*  That means that Holman's equal-protection harm could be remedied either by denying *everyone* debt relief (leveling down), or by allowing Holman to participate on a race-neutral basis in the debt-relief program (leveling up).  In this case, the court ordered the level-down remedy.

Holman argues that afforded him the irrevocable benefit of "[d]ay-by-day" equal treatment. Appellant Br. at 23–24. He might be right. The preliminary injunction, at minimum, ensured that no one got debt relief during its pendency. Holman was therefore not being discriminated against. The benefit of those days of equal treatment "could not be reversed." *Thomas*, 330 F.3d at 493; *see Heckler*, 465 U.S. at 739–40.

The counterargument is that the harm in this case is more appropriately tied to dollars—not days. The argument goes: The preliminary injunction merely delayed the spending of money, and because reversal of the preliminary injunction would have meant that the entire appropriation could later have been spent in a discriminatory manner, Holman avoided no harm. I don't think that's right on these facts. Section 1005 authorized the Secretary to make debt-relief payments based on amounts owed as of January 1, 2021. Pub. L. No. 117-2, § 1005(a)(2) (2021). At minimum, the preliminary injunction delayed those payments. In the interim, all borrowers were continuing to accrue interest that was not part of the outstanding indebtedness as of January 1, 2021. Plus, aside from any increase in interest expense, delay itself has a cost. *See Atl. Mut. Ins. Co. v. Comm'r*, 523 U.S. 382, 384 (1998) (explaining the "time value of money," *i.e.*, "the fact that a dollar today is worth more than a dollar tomorrow" (cleaned up)). So, even if the equal-protection harm in this case were merely a function of the value of the debt-relief program, the preliminary injunction irreversibly reduced that too.

The preliminary injunction in this case delayed debt-relief payments. That secured a period of equal treatment, meant that that all borrowers continued to accrue interest, and decreased the present value of the debt-relief program. That relief is irrevocable and, therefore, enduring.

3.

Whether the relief was material is also complicated. We have said that relief is material when it "directly benefits the plaintiff by modifying the defendant's behavior toward him." *NAACP*, 53 F.4th at 410 (cleaned up); *see Farrar v. Hobby*, 506 U.S. 103, 111–12 (1992). So, preventing the government from implementing a program that causes an injury would ordinarily qualify. Here, though, there were already two nationwide injunctions against the program.

*See Faust v. Vilsack*, 519 F. Supp. 3d 470, 478 (E.D. Wis. 2021); *Wynn v. Vilsack*, 545 F. Supp. 3d 1271, 1295 (M.D. Fla. 2021). The government argues that the relief was therefore not material. Is a defendant's behavior changed by an injunction enjoining something already enjoined? As a practical matter, no. But we have said that "the magnitude of a party's obtained relief does not dictate the outcome of the prevailing-party inquiry." *Planned Parenthood*, 931 F.3d at 541. Rather, the "touchstone" of the inquiry is whether there has been a meaningful "alteration of the legal relationship of the parties in a manner which Congress sought to promote in the fee statute." *Texas State Tchrs. Ass'n v. Garland Indep. Sch. Dist.*, 489 U.S. 782, 792–93 (1989). As a result, we look to the "relief requested in the complaint," "not the practical significance of the relief obtained." *McQueary*, 614 F.3d at 602 (cleaned up).

In *McQueary*, for example, the plaintiff obtained a preliminary injunction preventing enforcement of two provisions of law that prohibited certain protests. *Id.* The defendant argued that the relief was not material because there were yet other provisions of law, not challenged in that case, that also prohibited the protests. *Id.* This court was unmoved and said that the relief was material even if it had no practical significance. *Id.*

Like the plaintiff in *McQueary*, Holman obtained the relief he requested in his complaint—albeit preliminarily. That seems like enough. However, unlike in *McQueary*, the relief Holman requested in his complaint had, in a sense, already been ordered by other courts. I do not think that changes the outcome here, though. Those other decisions might have been reversed on appeal or otherwise have failed to convert into permanent injunctions; the parties, for example, might have settled, or the scope of the injunctions might have been narrowed. *See, e.g.*, *Commonwealth v. Biden*, 57 F.4th 545, 556–57 (6th Cir. 2023); *California v. Azar*, 911 F.3d 558, 583–85 (9th Cir. 2018). The relief in this case meant that Holman had the ability to enforce his injunction and was protected regardless of what happened in those other cases. Although somewhat difficult to square with the "modifying the defendant's behavior" formulation, the relief in this case was clearly a meaningful alteration of the legal relationship between the parties that directly benefitted Holman. Because this court's cases teach that our focus should be on the "relief requested in the complaint," not its "practical significance," I think that the relief obtained here qualifies as material. *McQueary*, 614 F.3d at 602.

C.

The government may still avoid paying fees and costs if it shows that "special circumstances make an award unjust." 28 U.S.C. § 2412(d)(1)(A). We look to general "equitable considerations" in evaluating this exception. *Sakhawati v. Lynch*, 839 F.3d 476, 478 (6th Cir. 2016). The government argues that there are three special circumstances here, but each falls short.

First, the government repackages its material-relief argument that the preliminary injunction provided no benefit beyond the already-existing nationwide injunctions. That argument is unavailing here for the same reasons it was unavailing there: Holman obtained the relief he requested in his complaint, which gave Holman added protection independent of those other cases. Second, the government notes that it was defending the constitutionality of a statute and contends that it is wrong to penalize an agency for complying with its statutory obligations. Whatever the policy merits of the government's argument, there is nothing in the Equal Access to Justice Act that supports a statutory-defense exception. Third, the government suggests that an award would be unjust because some of the fees Holman seeks are for work that occurred after the preliminary injunction entered. That is not a concern at this stage, though, because it does not mean that "an award" would be unjust. 28 U.S.C. § 2412(d)(1)(A). Rather, it goes to calculating "reasonable attorney fees." *Id.* § 2412(d)(2)(A); *see Sakhawati*, 839 F.3d at 480.

In this case, no special circumstances make an award unjust.

\* \* \*

My best read of our cases is that Holman is entitled to fees and costs because he is a prevailing party, the government's position was not substantially justified, and no special circumstances make an award unjust. I therefore respectfully dissent.