RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 25a0024p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

ROBERT HOLMAN,

    *Plaintiff-Appellant*,

v.

THOMAS J. VILSACK, in his official capacity as Secretary of the United States Department of Agriculture; ZACH DUCHENEAUX, in his official capacity as Administrator of the Farm Service Agency,

    *Defendants-Appellees*.

No. 23-5493

On Petition for Rehearing En Banc
United States District Court for the Western District of Tennessee at Jackson.
No. 1:21-cv-01085—S. Thomas Anderson, District Judge.

Decided and Filed: February 3, 2025

Before: STRANCH, LARSEN, and DAVIS, Circuit Judges.

_____

## COUNSEL

**ON PETITION FOR REHEARING EN BANC:** Braden H. Boucek, Kimberly S. Hermann, SOUTHEASTERN LEGAL FOUNDATION, Roswell, Georgia, William E. Trachman, MOUNTAIN STATES LEGAL FOUNDATION, Lakewood, Colorado, for Appellant. **ON RESPONSE:** Jeffrey E. Sandberg, Thomas Pulham, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellees. **ON BRIEF:** Daniel P. Lennington, WISCONSIN INSTITUTE FOR LAW & LIBERTY, Milwaukee, Wisconsin, David C. Tryon, Alex M. Certo, Thomas J. Gillen, THE BUCKEYE INSTITUTE, Columbus, Ohio, for Amici Curiae.

    The court delivered an order denying the petition for rehearing en banc. THAPAR, J. (pp. 3–10), delivered a separate opinion dissenting from the denial of the petition for rehearing en banc, in which BUSH, LARSEN, NALBANDIAN, and READLER, JJ., concurred.

---

**ORDER**

---

The court received a petition for rehearing en banc. The original panel has reviewed the petition for rehearing and concludes that the issues raised in the petition were fully considered upon the original submission and decision.

The petition was then circulated to the full court.[*] Less than a majority of the judges voted in favor of rehearing en banc. Judge Larsen would grant the petition for the reasons stated in her original dissent and for those stated in Judge Thapar's dissent to this order of denial.

Therefore, the petition is denied.

---

[*]Judge Ritz is recused from participation in this case.

**DISSENT**

THAPAR, Circuit Judge, dissenting. COVID-19 didn't discriminate against farmers based on the color of their skin. But the federal government did. The government conditioned a farmer's eligibility for COVID-era debt relief on his race. And the government favored certain races without any evidence of past discrimination against them. Apparently, COVID was a crisis not to be wasted—a chance to play racial favorites when distributing public funds. Luckily, the Constitution stood in the way.

Now, an American who challenged the government's racial discrimination in court, Robert Holman, seeks to recover attorney's fees for his efforts. The government says it shouldn't have to pay up because its legal defense of its racial discrimination was "substantially justified." But binding precedent said otherwise. Disregarding that precedent, a panel of our court sided with the government over Judge Larsen's thoughtful dissent. We should have granted rehearing en banc to fix this egregious error, and I respectfully dissent from our refusal to do so.

I.

Robert Holman's family has farmed Tennessee soil for four generations. Along with his dad, Holman grows corn and soybeans. In recent years, he took out two loans from the Department of Agriculture (USDA) to buy farming equipment. Given the pandemic's impact on the price of corn and soybeans, it became especially hard for farmers like Holman to pay back their loans.[1]

When Congress and President Biden created a debt relief program for farmers in the American Rescue Plan Act of 2021, Holman had hope. But that hope was soon dashed when he found out that the relief was not available for anyone with the wrong skin color.

---

[1] *See Tennessee Agricultural Sectors Taking a Hit from COVID-19*, UT Inst. of Agric. (Aug. 13, 2020), https://utianews.tennessee.edu/tennessee-agricultural-sectors-taking-a-hit-from-covid-19/.

Normally, the color of an American's skin doesn't block his access to government benefits. But it did here. The Act provided debt relief only to "socially disadvantaged" farmers. Pub. L. No. 117-2, § 1005(a)(2), 135 Stat. 4, 12 (2021). It defined "socially disadvantaged" farmers solely with reference to whether they were members of a group that's "been subjected to racial or ethnic prejudice." 7 U.S.C. § 2279(a)(5)–(6). The USDA determined that members of socially disadvantaged groups include but are not limited to: "American Indians or Alaskan Natives; Asians; Blacks or African Americans; Native Hawaiians or other Pacific Islanders; and Hispanics or Latinos." Notice of Funds Availability, 86 Fed. Reg. 28329, 28330 (May 26, 2021). All told, if not for his white skin, Holman would have qualified for the USDA's debt relief.

So he sued. Holman challenged the USDA's race-based determination of who counts as a "socially disadvantaged" farmer deserving of debt relief. He sought a preliminary injunction, and the government opposed his motion. The district court granted Holman preliminary relief. Congress then repealed the relevant portion of the American Rescue Plan, thereby mooting the case. The parties stipulated to dismissal.

Holman then moved for attorney's fees under the Equal Access to Justice Act (EAJA). To get those fees, Holman had to be a "prevailing party." 28 U.S.C. § 2412(d)(1)(A). But the government could avoid paying fees if its defense of the racially discriminatory debt relief program was "substantially justified" or if "special circumstances" would "make an award unjust." *Id.*

The district court found that Holman was not a "prevailing party" since he received only preliminary relief. When Holman appealed, the panel affirmed the district court's judgment without reaching the "prevailing party" question.**²** Instead, the panel concluded that Holman

---

**²**The Supreme Court is considering a case this term that tees up whether the winner of a preliminary injunction in a case that's later mooted is a "prevailing party." *See Lackey v. Stinnie*, No. 23-621 (4th Cir. argued Oct. 8, 2024). The Court's resolution of that case, which centers on 42 U.S.C. § 1988, will apply with full force to the statutory language at issue here, 28 U.S.C. § 2412(d)(1)(A). *See Hensley v. Eckerhart*, 461 U.S. 424, 433 n.7 (1983); *Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Hum. Res.*, 532 U.S. 598, 603 n.4 (2001). *Lackey*'s impact remains unclear. Regardless of *Lackey*, the "primary responsibility for the Sixth Circuit's errors rests with the Sixth Circuit." *Shoop v. Cunningham*, 143 S. Ct. 37, 44 (2022) (Thomas, J., dissenting from denial of certiorari).

didn't deserve fees because the government's position was "substantially justified." Judge Larsen dissented.

## II.

### A.

For the government's litigating position to be substantially justified, it must be reasonable. *Pierce v. Underwood*, 487 U.S. 552, 565, 566 n.2 (1988). So, in reaching a substantial justification determination, we "analyze *why* the government's position failed in court." *Taucher v. Brown-Hruska*, 396 F.3d 1168, 1174 (D.C. Cir. 2005) (Roberts, J.). If the government's position flouted "controlling case law," it isn't substantially justified. *Griffith v. Comm'r of Soc. Sec.*, 987 F.3d 556, 564 (6th Cir. 2021) (quoting *Taucher*, 396 F.3d at 1174). The government's position here contradicted binding precedent. Thus, it wasn't substantially justified.

The USDA expressly discriminated against citizens based on their race when distributing COVID-era debt relief. Thus, precedent made clear that the debt relief program had to surmount the high bar of strict scrutiny. *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 235 (1995). That meant that in addition to satisfying narrow tailoring requirements, the government needed to "show that favoring one race over another [was] necessary to achieve a compelling state interest." *Vitolo v. Guzman*, 999 F.3d 353, 360 (6th Cir. 2021).

What was the compelling interest? Allegedly, remedying the USDA's past racial discrimination and halting its continuing effects.

For such an interest to be valid, precedent left no doubt that the government had to provide actual evidence of past intentional discrimination. *Id.* at 361. That evidence is essential. It helps us differentiate between permissible remedial efforts that target specific episodes of past intentional discrimination and impermissible efforts that strive to remedy societal discrimination writ large. *Id.* Without such evidence, remedying the discrimination of yesterday becomes "an amorphous" and thus impermissible "end." *Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 735 (2007).

And that precedent exists for a good reason.  The Constitution is no friend to racial discrimination.  Under our Constitution, Americans are individuals of equal worth, not indistinguishable members of racial groups.  When the government crafts policies at odds with that core truth, precedent rightly requires the government to come armed with evidence justifying its actions.

But the government showed up here all but empty-handed.  For Native Hawaiians and other Pacific Islanders, the government offered no evidence of past discrimination at all.  That failure alone provides sufficient reason to conclude that the government's position wasn't "substantially justified" considering "controlling case law." *Taucher*, 396 F.3d at 1174.

Meanwhile, the government's evidence of past racial discrimination against Asians was inadequate.  The government first pointed to statistics indicating that Asian farmers defaulted on their loans more frequently than other farmers.  It also relied on two reports from 1997 and 2011 noting that Asian farmers had complained that the USDA hadn't treated them fairly.  Precedent made clear that such evidence couldn't support the government's racial classifications.

To begin, precedent established that the 1997 report was too dated to support an interest in remedying past discrimination. *Associated Gen. Contractors of Ohio, Inc. v. Drabik*, 214 F.3d 730, 735 (6th Cir. 2000) (noting that seventeen-year-old evidence of discrimination can't support a compelling-interest finding).  Precedent also made clear that the statistical disparities in loan delinquency couldn't themselves establish a compelling interest in remedying past discrimination. *Vitolo*, 999 F.3d at 361–62.  Nor did the complaints of unfair treatment documented in the reports cut it.  Evidence that some farmers felt the USDA had treated them unfairly is not evidence that the USDA intentionally discriminated against them because of the color of their skin.  Instead, such complaints amount to "vague reference[s] to a 'theme' of governmental discrimination," which are "not enough" to establish a compelling governmental interest in remedying past discrimination. *Id.* at 362.

In short, when it comes to race, precedent tightly constrains the government's ability to play favorites.  And for good reason.  "It is a sordid business, this divvying us up by race." *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 511 (2006) (opinion of Roberts,

C.J.). The Constitution's ideal is colorblind government policy. But the government hasn't always lived up to that ideal. And when the government tries to right its past racial wrongs, it cannot be too careful. If it isn't precise, attempts to remedy racial wrongs risk repeating them. Thus, there must be direct evidence of past intentional discrimination and proof that the government's attempt to write race back into our law is narrowly tailored to rectify past harms. Because the government's defense of giving racial preferences to Asians flouted that precedent, its position wasn't substantially justified.

In fact, the government's choice to lump "Asians" into a single racial bloc at the outset was indefensible. The USDA scheme treated "Asians" as a single racial unit. "Asians" is a strikingly loose racial category, capturing Japanese, Chinese, Koreans, Vietnamese, Indians, Kazakhs, and many others. Thus, the government fought for a scheme that painted with a broader racial brush than even the 1890 census—which grouped Americans into categories like "white," "black," "mulatto," "quadroon," "octoroon," "Chinese," "Japanese," and "Indian."[3] When it comes to Asians, the USDA's conception of race is less refined than that of the 1890 census takers. If those who used the racially stigmatizing term "octoroon" can grasp that "Asians" aren't all the same, surely the government today can too.

The USDA's reductionist racial categories open the door to more discrimination. If all these groups can be housed under the single "Asian" umbrella, the government can provide preferential treatment to one of these groups today because it intentionally discriminated against a different group yesterday. That is not right.[4]

To see why, consider the government's discrimination against Japanese Americans during World War II. By forcing Japanese Americans into internment camps, the government discriminated against them because of their race. To remedy this past intentional discrimination, President Ronald Reagan signed legislation to "make restitution to those individuals of Japanese

---

[3]*History: 1890*, U.S. Census Bureau, https://web.archive.org/web/20090929132248/http://www.census.gov/history/www/through_the_decades/index_of_questions/1890_1.html (last updated Sept. 1, 2009).

[4]What's more, the same is true for "Pacific Islanders." As far as I can tell, this term includes everyone who hails from Hawaii to the Cocos Islands—a group capturing areas with hundreds of ethnic groups and languages. According to the government's logic, Melanesians, Micronesians, and Polynesians—just to name a few—are all the same.

ancestry who were interned." Civil Liberties Act, Pub. L. No. 100-383, § 1(4), 102 Stat. 903 (1988). So, decades ago, the government made up for past racial discrimination by paying those it had harmed.

But by the government's logic today, it could point to internment of Japanese Americans as evidence of past discrimination and then pay reparations to all Asians. Neither the Constitution nor the precedent interpreting it supports such a capacious definition of race.

B.

To be sure, the government did marshal evidence of past intentional discrimination against black farmers. But precedent put the government on notice that when it "promulgates race-based policies, it must operate with a scalpel," not a sledgehammer. *Vitolo*, 999 F.3d at 361. Evidence of past discrimination against African Americans couldn't justify defending present discrimination in favor of Native Hawaiians, Asians, or any other group. If it did, then the government could come before the court and cite past intentional discrimination against one racial group to justify discrimination in favor of any other racial group today. The Constitution stands in the way of such nonsense.

In other words, the government can't sneak in racial discrimination in favor of one group on the back of evidence of past racial discrimination against another. Had the USDA only discriminated in favor of, say, Native Hawaiians and other Pacific Islanders, its defense of that discrimination would not be substantially justified—there's no evidence. Bundling a baseless racial preference with a more defensible, evidence-backed racial preference doesn't change anything.

When the government distributes benefits, the Constitution demands that it treat us as individuals, not members of interchangeable racial groups. And precedent made that crystal clear when the government litigated this case. Therefore, its litigating position was inexcusable, not substantially justified.

III.

This case warranted en banc review. The panel opinion blessed a baseless defense of the government's discrimination. Litigating positions that defy precedent are not substantially justified. Saying otherwise does violence to the substantial justification standard—it's permissive, not toothless.

And this case presents "questions of exceptional importance." Fed. R. App. P. 40(b)(2)(D). The government tells us that this case is not noteworthy because it deals with a small, fact-bound attorney's fees dispute.

But it's exceptionally important that we correctly interpret fee-shifting standards that, when properly applied, disincentivize discrimination. If an agency is on the wrong side of a court's prevailing-party determination, the EAJA requires the agency to pay up. *See* 28 U.S.C. § 2412(d)(4). Financial penalties for unsuccessful attempts at racial discrimination should make agencies less eager to discriminate in the first place. And that agency might have to answer to Congress when the next appropriations bill is on the table. On the other hand, if an agency knows that its failed gambits can be recast in court as "substantially justified," it will be more apt to try its hand at playing racial favorites; the costs would be low. Shaping federal agencies' incentive structures when they consider whether to racially discriminate is exceptionally important.

Similarly, watering down the substantial justification standard will discourage challenges like Holman's to unlawful congressional or agency action, even when plaintiffs know they have a strong case on the merits. It's exceptionally important that we not disincentivize such suits.

Further, leaving the panel opinion on the books risks confusing district courts. As an appellate court our job is to synthesize and clarify legal doctrines so district courts can apply them in an accurate and efficient manner. What are district courts to think now? On the one hand, we have told them that the government's litigating position is not substantially justified if it skirts controlling precedent. On the other hand, this case endorses a litigating position that disregards controlling precedent as "substantially justified." We're speaking out of both sides of our mouth. And in service of what? Giving the government a pass at treating Americans

differently because of their race.  We should have cleaned up our own mess rather than leaving it to district courts to sort out.

\*　　\*　　\*

Some in the federal government saw the instability unleashed by COVID as a crisis not to be wasted.  They saw it as an opportunity to write race back into the law.

But they forgot that dividing ourselves by race in the United States Code and the Federal Register will divide us by race in the real world.  They forgot that "every time the government places citizens on racial registers and makes race relevant to the provision of burdens or benefits, it demeans us all."  *Grutter v. Bollinger*, 539 U.S. 306, 353 (2003) (Thomas, J., concurring in part and dissenting in part).  And they forgot that history has not looked kindly at the government's attempts to use emergencies as excuses to discriminate.  *See Korematsu v. United States*, 323 U.S. 214 (1944), *overruled by Trump v. Hawaii*, 585 U.S. 667 (2018).  As Justice Harlan observed, "[t]he Constitution is not to be obeyed or disobeyed as the circumstances of a particular crisis . . . may suggest."  *Downes v. Bidwell*, 182 U.S. 244, 384 (1901) (Harlan, J., dissenting).  A crisis doesn't justify turning our backs on his teaching that the Constitution "is color-blind, and neither knows nor tolerates classes among citizens.  In respect of civil rights, all citizens are equal before the law."  *Plessy v. Ferguson*, 163 U.S. 537, 559 (1896) (Harlan, J., dissenting).

When the government concocts policies that violate this core truth, its defenses of those policies are not "substantially justified."  They are without foundation in the Constitution.  I respectfully dissent from the denial of rehearing en banc.

　　　　　　　　　　　　　　　　　　ENTERED BY ORDER OF THE COURT

　　　　　　　　　　　　　　　　　　*[signature: Kelly L. Stephens]*
　　　　　　　　　　　　　　　　　　_____
　　　　　　　　　　　　　　　　　　Kelly L. Stephens, Clerk